# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL WALSH,                    :        No. 3:06cv504
           **Plaintiff**           :
                            :        **(Judge Munley)**
                            :
          **v.**                         :
                            :
**BANK OF AMERICA,**              :
           **Defendant**           :

## MEMORANDUM

Before the court are plaintiff's objections (Doc. 61) to the report and recommendation (Doc. 60) of Magistrate Judge Thomas M. Blewitt, which proposes that we grant defendant's motion for summary judgment in the instant disability discrimination case. Having been fully briefed, the matter is ripe for disposition.

**Background**

This case arises from plaintiff's employment with defendant as a customer service representative at defendant's Scranton, Pennsylvania call center. (Defendant's Statement of Material Facts (Doc. 31) (hereinafter "Defendant's Statement") at ¶¶ 1, 3).[1] As a customer service representative, plaintiff answered inbound calls from customers regarding their bank accounts. (Id. at ¶ 7). His job required that he perform account maintenance on customer's accounts, answer

---

[1] Defendant filed a statement of material facts in connection with its motion for summary judgment, and plaintiff responded to this statement. We will cite to the defendant's statement for facts that are undisputed. Where the facts are disputed and material, we will note that.

questions, make changes to accounts, and sell other banking products to those customers.  (Id.).  Plaintiff held that job from December 1999 until May 18, 2005, when he was terminated.  (Id. at ¶ 1).  Sometime in the mid 1990s, plaintiff was diagnosed as suffering from post-traumatic stress disorder ("PTSD") as a result of his military service in the Vietnam War.  (Id. at ¶ 4).

The parties disagree about the nature and extent of training plaintiff received for his position.  (See Defendant's Statement at ¶¶ 8-9, Plaintiff's Counterstatement of Material Facts (hereinafter "Plaintiff's Statement") at ¶¶ 8-9).  Plaintiff worked with dozens of other employees as he answered phones from a cubicle in defendant's call center.  (Defendant's Statement at ¶ 10).  These employees were broken into smaller groups and assigned a particular supervisor.  (Id.).  Maureen Williamson served as one of plaintiff's supervisors during most of his employment.  (Id.).  She did not serve in this position continuously, however, and plaintiff described her presence as "on and off."  (Plaintiff's Deposition (hereinafter "Plaintiff's Dep."), attached as Exh. A (Doc. 52-2) to Plaintiff's Statement at 54).  Other managers supervised plaintiff during Williamson's absences.  (Affidavit of Maureen Williamson (hereinafter "Williamson Dep." attached as Exh. B. to Defendant's Statement, at ¶ 3).  In February 2005, Williamson assumed a new role in the bank and plaintiff joined a "team" supervised by Elizabeth Slattery.  (Defendant's Statement at ¶ 11).  In March 2005 Slattery moved out of state and management again assigned plaintiff to a new group, this one supervised by Patricia Shultz.  (Id.).

2

Plaintiff typically worked eight hours a day. (Plaintiff's Dep. at 53). At first, he began working at 11:30 a.m., but gradually began to take earlier shifts. (Id.). Eventually, he began starting his work day around 7 a.m., remaining until 3 p.m. (Id.). He preferred to work that shift. (Id.). Though plaintiff was allowed breaks during his shift, he was generally expected to remain at his desk and answer telephone calls. (Defendant's Statement at ¶ 13).

Company officials monitored and evaluated plaintiff's job performance. These evaluations rated plaintiff on a performance scale from 1 to 5, with 5 being the highest score. A score of 3 indicated a "solid performer" and a score of 2 pointed suggested "improvement needed. (See Defendants' Exh. D-3 (Doc. 32-4)). In 2002, Williamson evaluated plaintiff, finding him satisfactory or higher in every category the company used.[2] (Doc. 32-1). Plaintiff's 2003 evaluation consisted mostly of positive ratings, with scores of 3 or higher. (Doc. 32-3). Williamson found, however, that plaintiff needed improvement in communication and "results orientation." (Id.). Plaintiff's evaluation in 2004 was similar, though he had improved his "results orientation" score to a 3. (Doc. 32-4). Supervisors also evaluated plaintiff's work fielding telephone calls. These ratings were performed by supervisors and evaluators who randomly listened to a series of calls and gave them a percentage score. (Affidavit of Walsh, Exh. B. At ¶ 6). Screeners considered communication

---

[2]Neither Slattery nor Schultz supervised plaintiff long enough to provide an evaluation. (Defendant's Statement at ¶ 16).

skills and adherence to Bank procedures, among other factors, in evaluating representatives' performance.  (Id. at ¶ 7).

The parties disagree about how frequently supervisors listened to calls the plaintiff handled.  (Id. at ¶ 18).  Different persons would listen to calls and evaluate them in an attempt to achieve consistency in evaluations.  (Id. at ¶ 19).  Plaintiff insists that his calls did not go through this "calibration" process, since wide differences between the scores assessed by different evaluators existed for his calls. (Plaintiff's Statement at ¶ 19).  To achieve a passing score on these evaluations, a representative needed to receive a grade of 81.82%.  (Defendant's Statement at ¶ 20).  Scores lower than that range indicated that the representative had failed to follow procedures required for such calls.  (Id.).  Plaintiff contends that he consistently received high scores on these evaluations, and that his scores only decreased when defendant decided to discriminate against him.  (Plaintiff's Statement at ¶ 20).  Plaintiff received scores of 57.58% in both April and May of 2005.  (Defendant's Statement at ¶ 21).  He contends that no valid reason existed for assigning these scores, though he does not dispute receiving low scores on occasion.  (Plaintiff's Statement at ¶¶ 21-22; Defendant's Statement at ¶ 22). Plaintiff received scores other low scores as well.  (Defendant's Statement at ¶ 23; Plaintiff's Statement at ¶ 23).[3]

---

[3]Plaintiff contends that when he "began to notice that his scores were lower than normal he went to Williamson and asked for training and a sit down.  She told him not to worry and that she only had time for people with problems.  Plaintiff noticed that although

Plaintiff received counseling from Williamson for his low performance scores in December 2004.  (Defendant's Statement at ¶ 24).  The parties disagree over whether Williamson identified specific problems with plaintiff's performance in their meeting.  (Id.; Plaintiff's Statement at ¶ 24).  During this session, plaintiff noted that he had consistently received good performance evaluations and asked why he had been assigned training.  (Id.).  In early 2005, Williams issued plaintiff a formal "Development Action Plan," which noted deficiencies in his performance and that he receive particular training.  (Defendant's Statement at ¶ 25; Plaintiff's Statement at ¶ 25).  The parties dispute whether plaintiff actually signed this action plan. (Defendant's Statement at ¶ 26; Plaintiff's Statement at ¶ 26).  Plaintiff ascribed at least some of his problems at the end of 2004 and beginning of 2005 to changes in the medication he was taking.  (Defendant's Statement at ¶ 27; Plaintiff's Statement at ¶ 27).  He also told Williamson in spring 2005 that his medication had been changed, and on at least one day he left work early due to the effects of this change. (Defendant's Statement at ¶¶ 28-29; Plaintiff's Statement at ¶¶ 28-29).  Plaintiff testified that he returned to work the next day and did not have any "follow-up conversation" with Williamson about his medication.[4]  (Plaintiff's Dep. at 77).  He

―――――――――――――――

his scores were lower so were the target scores.  The scores were listed at 77% and 78%. His scores were more in line with these target scores and therefore was surprised after asking for training and direction from Williamson that he was instead presented with a verbal warning.

[4]Plaintiff denies the sequence of these conversations, but does not deny that he did not raise the issue of the effects of his medication with Williamson after April 2005.  (See Plaintiff's Statement at ¶¶ 28-29).

also testified that his mental state while working for defendant "was active; and if somebody said something I would know it.  I got to know the job pretty good."  (Id. at 171-72).  Except for a period of two weeks in 2005 when he was "a little shaky," plaintiff "was able to understand what the job required."  (Id. at 172).  As a result of these discussions about medication, as well as earlier personal conversations, Williamson was aware of plaintiff's PTSD and some of the symptoms he suffered therefrom sometime before April 2005.  (Defendant's Statement at ¶ 31; Plaintiff's Dep. at 84).[5]  Plaintiff told Williamson that he had bad dreams, but provided little other detail about his condition, and did not tell her that PTSD effected his job performance, since he "was doing fine on [his] job."[6]  (Plaintiff's Dep. at 83, 85).

Criticism of plaintiff's performance grew after Williamson left and Patricia Schultz became his supervisor.  Schultz testified that she was aware that plaintiff had difficulties with his performance under the previous supervisor, but insisted that she was not aware that he suffered from PTSD or any other ailment.  (Schultz Affidavit., Exh. E to Defendant's Statement at ¶ 3).  During March and April 2005

---

[5]Plaintiff's deposition testimony is somewhat unclear about exactly when he informed Williamson that he suffered from PTSD.  He testified that "I told [Williamson] I was a disabled veteran in 2000, but if I told her I had PTSD or not I do not remember that specifically.  I did at one time tell her that I had PTSD because her son was going to Iraq and she was worried about him."  (Plaintiff's Dep. at 83).  When pressed about the date of this conversation, plaintiff replied that "It was 2003, 2004 yes."  Id.

[6]Plaintiff contends that "[a]lthough Plaintiff did not discuss in detail the symptoms of PTSD[,] as a supervisor Ms. Williamson would be aware that accommodations must be made for disabilities such as PTSD and should have conducted an investigation." (Plaintiff's Statement at ¶ 32).

plaintiff received a series of unsatisfactory results on his performance scores.

(Defendant's Statement at ¶ 34).[7]  These results led to discussions with Schultz,

particularly over an April 2005 call where the plaintiff gave a customer a rebate

without a request from that customer.  (Id. at ¶ 35).  Plaintiff received a verbal

warning for this action, though he contends that he acted in the best interest of the

company by anticipating the customer's account problems and preventing the need

for her to call on another day and receive another rebate.[8]  (Plaintiff's Statement at ¶

35).

    The parties disagree about whether plaintiff informed Schultz that he suffered

from PTSD during this meeting.  (Defendant's Statement at ¶ 36; Plaintiff's

Statement at ¶ 36).  Plaintiff alleges that he gave Schultz a document that described

the PTSD from which he suffered, but admits that the document did not relate any

---

[7]Plaintiff denies this statement, but in explaining his denial does not address the number of low scores he received.  Instead, he insists that he made Walsh aware of his illness, told her he was having problems with his medication, and requested certain accommodations for his illness.  (See Plaintiff's Statement at ¶ 34).

[8]Plaintiff explained the situation this way: he received a score of "72 for it, which was a bad score, saying that I didn't do something in the best interest of Bank of America.  The story was that some young lady called me up and she never had a rebate before.  She got a $25 overdraft fee and the next day she was going to get two more, which totaled another $50.  I knew when she seen that she'll call back the next day.  I have been there five years and I know what is going on.  She started complaining and I said that I'll give you $25 back.  She did not ask for it.  I knew she would call back the next day and probably get $50 or $75 back.  So Ms. Schultz–as a good a supervisor as she is, . . . didn't look and see that she was going to get two more overdrafts.  All she said was that I didn't work in the best interest of the Bank of America, which I did work in the best interest of Bank of America, because I helped her out then so she wouldn't call the next day and get another two rebates."  (Plaintiff's Dep. at 96-97).

specific symptoms the plaintiff suffered.  (Plaintiff's Dep. at 106).[9]  The parties agree, however, that plaintiff ascribed some of his difficulties to changes in his medication. (Defendant's Statement at ¶ 38).  Plaintiff contends that at some point he informed plaintiff of his disease and asked to be placed on six-hour days.  (Plaintiff's Statement at ¶ 38).  The parties agree that at some point Schultz requested that plaintiff provide her with documentation of his condition.  (Plaintiff's Statement at ¶ 38; Defendant's Statement at ¶ 40).

Due to plaintiff's continuing performance problems, Schultz contacted the Advice & Counsel division of defendant's human resources department. (Defendant's Statement at ¶ 39).  She informed them of plaintiff's low monitoring scores and described the contents of one particular call, which received a score of 57.8%.  (Id.).  Schultz contends that it was after this meeting that she asked plaintiff to provide documentation of his illness.  (Id. at ¶ 40).  Plaintiff provided Schultz with an undated, unsigned excerpt from a medical analysis of his symptoms, as well as a pamphlet about PTSD issued by the VA hopsital in Coatesville, Pennsylvania.  (Id. at ¶ 41).  Plaintiff provided no other material on his condition to defendant.  (Id. at ¶ 42).  Upon receiving this material, Schultz told plaintiff that her father was a veteran as well.  (Id. at ¶ 43).  Plaintiff insists that Schultz also "rolled her eyes up in the air"

---

[9]Plaintiff's testimony related that: "Q.  The paper that you gave to Ms. Schultz, did it say anything about your condition and the symptoms that you have?  A.  All it did was show the symptoms that a person with PTSD would have.  Q.  Any person?  A.  Any person.  It showed like I get 50 percent of . . . you can still be employable.  70 percent–it goes down like that."  (Plaintiff's Dep. at 106).

when she made this remark, and that he perceived her attitude towards him changing "for the worse" after this point.  (Plaintiff's Statement at ¶ 43).  Schultz also provided plaintiff, on May 6, 2005, with a "final written counseling–performance." (Defendant's Statement at ¶ 44).  That written warning concluded that plaintiff had failed to improve his performance on calls and had continued not to verify information as required by company rules.  (Id.).  The document warned that failure to improve performance could "result in further disciplinary action up to and including termination."  (Id.).

Between May 6 and May 18, 2005, Schultz monitored three of plaintiff's calls. (Defendant's Statement at ¶ 45).  All of those calls received ratings below 81.82%, which defendant insists was the minimum required by the company.  (Id.).  Plaintiff disputes that, contending that he needed only to reach 77% or 78% under company rules.  (Plaintiff's Statement at ¶ 45).  Schultz determined that plaintiff failed properly to verify a customer's identity on at least one of the calls.  (Defendant's Statement at ¶ 46).  She had recorded this call, and played a tape of it for her supervisor, Dorothy Walker.  (Id.).  Walker listened to the call, and then endorsed Schultz's recommendation that Walker be terminated.  (Id.).  Walker claims she was not aware that plaintiff suffered from PTSD when she recommended his firing.  (Id.; Deposition of Dorothy Walker, Exh. B. to Defendant's Satement at ¶ 10).[10]  After speaking with

---

[10]Plaintiff contends that "[i]t is not known that Walker didn't have information concerning Walsh's disability as it was posted on his employee profile, but it is relevant as Schultz knew as well as other supervisors and Advice & Counsel.  It is seeming unrealistic

Advice & Counsel, Schultz determined to fire the plaintiff.  (Defendant's Statement at ¶ 47).  On May 18, 2005, during a meeting at which Walsh was present, Schultz informed plaintiff that he had been terminated.  (Id. at ¶ 48).  Plaintiff did not mention his PTSD at this meeting.  (Id.).

On March 8, 2006, plaintiff filed his complaint in this court.  (See Complaint (Doc. 1) (hereinafter "Complt.").  That complaint alleged that plaintiff suffered from post traumatic stress disorder, and that he had informed his employer of that condition.  (Id. at ¶¶ 10-11).  The complaint raised two counts.  First, plaintiff alleged that defendant violated his rights under the Americans with Disabilities Act, 42 U.S.C. § 12101 ("ADA") by taking an adverse employment action against him because of his disability.  (Id. at ¶ 24).  Count II brought identical claims under the Pennsylvania Human Relations Act, 42 P.S. § 955(a) ("PHRA").  As relief, plaintiff sought reinstatement and monetary damages.  The case was assigned to Magistrate Judge Blewitt for preliminary proceedings, where the parties conducted discovery and the defendant eventually filed the instant dispositive motion.

On November 26, 2007, Magistrate Judge Thomas M. Blewitt issued his report

---

that Schultz who is concerned enough to be speaking to Advice and Counsel would not at least give Walker a heads up as to what legal ramifications this might entail."  (Defendant's Statement at ¶ 46).  We note, first, that the employee information submitted by plaintiff indicates that he is a "disabled Vietnam veteran," but does not specify that he suffers from PTSD and does not contain any information about his limitations.  (See Doc. 52-4).  In addition, plaintiff presents no evidence to indicate that Walsh ever read his employee file, that anyone in Advice and Counsel discussed plaintiff's particular health issues with her, or that she spoke with anyone about potential legal liability.  A fact is not in dispute if no evidence exists to support the position of the party disputing that fact.

and recommendation in the case.  (Doc. 60).  Magistrate Judge Blewitt recommended that we grant defendant's motion for summary judgment on plaintiff's ADA claim.  Plaintiff, the magistrate judge found, had not established that he suffered from a disability that substantially limited a major life activity or that defendant considered him to be suffering from such a disability.  As a result, no jury could find for him on his ADA claim.  The magistrate judge also found that even if plaintiff did suffer from a disability, he was not entitled to relief under the Act because he had not informed his employer of a need for an accommodation.  Because claims under the Pennsylvania Human Relations Act share legal standards with those under federal anti-discrimination law, Magistrate Judge Blewitt also proposed that we grant the defendant's summary judgment on plaintiff's PHRA claim.

After the magistrate judge issued his report and recommendation, plaintiff filed objections and a brief in support thereof.  Defendant then filed a brief in opposition, bringing the case to its present posture.

**Jurisdiction**

As this case is brought pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, we have jurisdiction pursuant to 28 U.S.C. § 1332.  ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").  We  have supplemental jurisdiction over the plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

**Legal Standard**

In disposing of objections to a magistrate judge's report and recommendation, the district court must make a *de novo* determination of those portions of the report to which objections are made.  28 U.S.C. § 636 (b)(1)(C); see also Henderson v. Carlson, 812 F.2d 874, 877 (3d Cir. 1987).  This court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The district court judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. Id.

When no objections to the report and recommendation have been filed, in order to decide whether to adopt the report and recommendation, we must determine whether a review of the record evidences plain error or manifest injustice. See, e.g., Sullivan v. Cuyler, 723 F.2d 1077, 1085 (3d Cir. 1983); FED. R. CIV. P. 72(b) 1983 Advisory Committee Notes ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record to accept the recommendation"); 28 U.S.C. § 636(b)(1).

The case comes before this court on a motion for summary judgment. Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise

12

properly supported motion for summary judgment; the requirement is that there be

no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the

facts in the light most favorable to the party opposing the motion. International Raw

Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990). The

burden is on the moving party to demonstrate that the evidence is such that a

reasonable jury could not return a verdict for the non-moving party. Anderson, 477

U.S. at 248 (1986). A fact is material when it might affect the outcome of the suit

under the governing law. Id. Where the non-moving party will bear the burden of

proof at trial, the party moving for summary judgment may meet its burden by

showing that the evidentiary materials of record, if reduced to admissible evidence,

would be insufficient to carry the non-movant's burden of proof at trial. Celotex v.

Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the

burden shifts to the nonmoving party, who must go beyond its pleadings, and

designate specific facts by the use of affidavits, depositions, admissions, or answers

to interrogatories showing that there is a genuine issue for trial. Id. at 324.

**Discussion**

Since we agree that we must consider plaintiff's PHRA claim under the same

legal standards as we consider his ADA action, our analysis will focus only on the

magistrate judge's recommendation that we grant summary judgment for the

defendant under the ADA.  See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306

(3d Cir. 1999) (concluding that in a case where plaintiff brought both ADA and PHRA

claims "we will only discuss [plaintiff's] ADA claim because our analysis of an ADA

claim applies equally to a PHRA claim.").

Plaintiff raises several objections to the report and recommendation.  We will

address each in turn, as necessary.

### i.  the magistrate judge's interpretation of plaintiff's affidavit

Plaintiff argues that the magistrate judge improperly discredited an affidavit he

submitted as part of his response to the motion for summary judgment.  Plaintiff

contends that the magistrate judge considered the affidavit a "sham" and discounted

it entirely.  The court should not have disregarded the affidavit, plaintiff argues,

because there was evidence in the record to support the statements he made in that

document.

The Third Circuit Court of Appeals has noted that "[t]he Federal Rules of Civil

Procedure do not prescribe how courts should address" affidavits that contradict

prior deposition testimony.  Jiminez v. All American Rathskeller, Inc., 503 F.3d 247,

251 (3d Cir. 2007).  Still, "'a party may not create a material issue of fact to defeat

summary judgment by filing an affidavit disputing his or her own sworn testimony

without demonstrating a plausible explanation for the conflict.'"  Id.  Courts have

termed an affidavit produced solely for this purpose a "sham affidavit," and found

that such a document "cannot raise a genuine issue of fact because it is merely a

14

variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant." Id. at 253.  Not all affidavits that contradict previous sworn testimony are shams, however, and "'[w]hen there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit.'" Id. (quoting Baer v. Chase, 392 F.3d 609, 625 (3d Cir. 2004)).  That additional evidence "may establish that the affiant was 'understandably' mistaken, confused, or not in possession of all the facts during the previous deposition," and the proponent of the affidavit also "has the opportunity to offer a 'satisfactory explanation' for the conflict between the prior deposition and the affidavit." Id. (quoting Hackman v. Valley Fair, 932 F.2d 239, 241 (3d Cir. 1991)).  If a party fails to "explain the contradiction between a subsequent affidavit and a prior deposition, it is appropriate for the district court to disregard the subsequent affidavit and the alleged factual issue in dispute as a 'sham,' therefore not creating an impediment to a grant of summary judgment based on the deposition." Id.

Here, the magistrate judge found that plaintiff's affidavit, executed after he gave his deposition and made to contest defendant's summary judgment motion, contradicted plaintiff's prior deposition testimony without proper explanation on several issues.  The magistrate judge therefore disregarded the affidavit on those points.  Plaintiff asserts that these findings were improper, because the affidavit does not contradict his earlier deposition testimony and therefore does not qualify for exclusion under the "sham" doctrine.  Plaintiff points to three instances where he

15

concludes that the magistrate judge disregarded his affidavit and challenges each decision as improper.  We will address each in turn.

First, plaintiff contends the magistrate judge erred in finding plaintiff's affidavit and deposition testimony contradictory in describing whether plaintiff had informed his supervisor Jim Bell that he suffered from PTSD.  Plaintiff's affidavit claims that he "told Jim Bell, Supervisor, about my PTSD symptoms and that I needed to go away to Lyons, VA Hospital for two weeks to get a tune-up right after September 11, 2001."  (Plaintiff's Affidavit at ¶ 87).  In his deposition, plaintiff testified that he had been forced to take time off work due to PTSD symptoms after the terrorist attacks of September 11, 2001.  (Plaintiff's Dep. at 86).  He reported to Jim Bell that he might need two weeks off to visit the Veteran's Administration Hospital in Lyons, New Jersey for a "tune up."  (Id.).  Plaintiff described this conversation as "very minor, very small. I just said that I might have to go away for two weeks to Lyons."  (Id. at 87).  Asked by defense counsel if "in your conversation with Jim Bell, other than telling him that you might have to go to Lyons, did you tell him you have PTSD?" plaintiff replied that "I don't recall telling him that."  (Id. at 88).  Plaintiff's affidavit and deposition clearly contradict each other the issue of whether plaintiff informed Jim Bell that he needed time off due to PTSD when seeking a leave after September 11, 2001.[11]  Plaintiff has offered no explanation for this clear contradiction, and we

_____

[11]Plaintiff focuses on his testimony that after September 11, 2001 he told Bell that "I might have to go away for two weeks to get a tune-up.  He said that that's fine.  I told him about it."  (Plaintiff's Dep. at 86).  Plaintiff contends that this testimony should be read to

therefore agree with the magistrate judge that the paragraph from the affidavit should have been disregarded.

Plaintiff also disputes the magistrate judge's finding that plaintiff's deposition and affidavit contradicted each other on the issue of whether his PTSD forced him to take personal, vacation and sick time from work.  In his affidavit, plaintiff states that "[w]hen I needed time off due to PTSD I would take personal, vacation and sick time." (Plaintiff's Affidavit at ¶ 94).  During his deposition, defense counsel asked plaintiff if, "other than the time when you told me that you had to leave early that day in January '05 because of the change in medication, was there any other time that you recall having to miss work because of your PTSD?"  (Plaintiff's Dep. at 176)  Plaintiff answered, "[n]o.  Like I said, I wanted to go to the hospital but I didn't go." (Id. at 177).  Even after the attacks on September 11, plaintiff testified, "I never asked for time off for anything like that.  I figured I would keep my mind occupied and help the people out who helped me."  (Id.).  As the magistrate judge did, we find these statements contradictory.  Plaintiff offers no explanation for why his later-executed affidavit avers that his PTSD forced him to take days off work, even though he testified to a contradictory set of facts at his deposition.  The magistrate judge

---

say that had elaborated on why he had to go to the hospital in his conversation with Bell, and that such elaboration necessarily included a description of his PTSD problems.  We find the statement ambiguous.  Defense counsel apparently did as well, and so directly asked plaintiff if he had described his PTSD and symptoms therefrom to Bell.  (See Id. at 88).  He replied that he had not, removing any ambiguity about the contents of this conversation from the record.  (Id.).  His affidavit clearly contradicts that statement and the magistrate judge properly disregarded that paragraph.

17

properly disregarded plaintiff's affidavit on this point.

Finally, plaintiff contends that the magistrate judge improperly disregarded statements in plaintiff's affidavit that described difficulties he faced in sleeping caused by his PTSD.  We will likewise dismiss plaintiff's objection on this issue. While the magistrate judge eventually concluded that plaintiff did not face problems sleeping severe enough for the court to consider him disabled on those grounds, he did not reject the plaintiff's affidavit on this issue.  In describing the facts of the case, the magistrate judge noted that the plaintiff had testified that he had difficulty sleeping, and that "[p]laintiff's affidavit directly disputes Defendant's contention that his sleeping problem and apnea was not related to his stress."  (Report and Recommendation (Doc. 60) at 17).  The magistrate judge cited to the affidavit for this finding.  Here, therefore, the magistrate judge found that the affidavit did not directly contradict plaintiff's deposition testimony and concluded that an issue of material fact existed over the causes of plaintiff's difficulty in sleeping.  Since the magistrate judge did not disregard plaintiff's after-executed affidavit on this issue, we find the objection on this issue moot. We therefore have found no grounds for any of plaintiff's complaints about the magistrate judge's use of his affidavit, and will dismiss the plaintiff's objections on this point.

### ii.  the court's determination that plaintiff's PTSD was not a disability under the ADA, and that plaintiff was not disabled

Several of the objections plaintiff raises are connected to the magistrate

judge's recommendation that we find plaintiff is not disabled under the ADA and

therefore not entitled to relief.  We will treat those together and evaluate whether the

magistrate judge correctly concluded that the evidence does not support a finding

that plaintiff's post-traumatic stress disorder substantially limited a major life

activity.[12]

The Americans with Disabilities Act provides that "[n]o covered entity shall

discriminate against a qualified individual with a disability because of the disability of

such individual in regard to job application procedures, the hiring, advancement, or

discharge of employees, employee compensation, job training, and other terms,

conditions and privileges of employment."  42 U.S.C. § 12112(a).  To obtain relief

under the employment provisions of the ADA, "a plaintiff must demonstrate that he or

she is a 'qualified individual with a disability' within the meaning of the Act, and that

---

[12]In challenging the magistrate judge's opinion, plaintiff argues that the magistrate judge erred in not considering whether defendant engaged in an appropriate "interactive process" to determine whether a reasonable accommodation could be provided for plaintiff's disability.  (See Plaintiff's Brief at 6).  We note this argument is immaterial to the question of whether plaintiff suffered from a substantial limitation as a result of his disability, but instead describes a later point in the process mandated by the ADA.  As the The Code of Federal Regulations provides that "*once a qualified individual with a disability* has requested provision of a reasonable accommodation, the employment must make a reasonable effort to determine the appropriate accommodation.  The appropriate accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability."  29 C.F.R. §1630 APPENDIX, at §1630.9 (emphasis added).  Unless plaintiff can show that he is a qualified person with a disability, he has no legal right to demand that his employer engage in an interactive process about accommodation for that disability.  Though plaintiff's argument in his brief focuses on defendant's responsibilities to a person with a disability in the interactive process, and not on whether plaintiff was actually a qualified person with a disability, we will nevertheless address the soundness of the magistrate judge's finding that plaintiff did not suffer from a substantial limitation to major life activity.

he or she has suffered an adverse employment decision as a result of the

discrimination." Tice v. Ctr. Area Transp. Auth., 247 F.3d 506, 512 (3d Cir. 2001).

The Third Circuit Court of Appeals has described a three-part test for determining

whether an ADA plaintiff has made out a prima facie case for relief under the act: "[a

plaintiff] must establish that she (1) has a 'disability,' (2) is a 'qualified individual,' and

(3) has suffered an adverse employment action because of that disability." Turner v.

Hershey Chocolate USA, 440 F.3d 604, 611 (3d Cir. 2006).  The dispute here

centers on the first of those elements.

The ADA defines a "'qualified individual with a disability'" as "'an individual with

a disability who, with or without reasonable accommodation, can perform the

essential functions of the employment position that such individual holds or desires.'"

Id. (quoting 42 U.S.C. § 12111(8)).  A disability can be defined in any of three ways:

"(A) physical or mental impairment that substantially limits one or more of the major

life activities of such individual; (B) a record of such impairment; or (C) being

regarded as having such an impairment." Id. (quoting 42 U.S.C. § 12102(2)).  A

plaintiff who cannot establish that she is disabled pursuant to the statute cannot

prevail in an ADA employment discrimination action.  See Taylor v. Phoenixville Area

Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (finding that "in order to establish a

prima facie case of discrimination under the ADA, the plaintiff must show: '(1) he is a

disabled person within the meaning of the ADA; (2) he is otherwise qualified to

perform the essential functions of the job, with or without reasonable

20

accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as the result of discrimination.'") (quoting Gaul v. Lucent Technologies, 134 F.3d 576, 580 (3d Cir. 1998)).

Here, the magistrate judge found that plaintiff had not shown that his PTSD substantially limited any major life activity.  The Third Circuit has found that "[in] determining whether a plaintiff's impairment substantially limits a major life activity, the Supreme Court has stressed that courts should 'determine the existence of disabilities on a case-by-case basis.'" Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (quoting Albertson's, Inc. v. Kirkingburg, 527 U.S. 555 (1999)). To make that assessment, a court "must begin by identifying the specific life activity or life activities that [plaintiff] says her disorder affected and then evaluate whether her condition 'substantially limits' those life activities." Id. at 306-307.  In such cases, "[i]t is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment.  Instead, the ADA requires those 'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial.'" Toyota Motor Mfg, Kentucky v. Williams, 534 U.S. 184,198 (2002) (quoting Albertson's, Inc., at 567).

The need for such a fact-specific inquiry is underscored by the difficulties inherent in any evaluation of whether a condition is substantially limiting.  As courts have found, "[t]he ADA does not define 'substantially limits,' but 'substantially'

21

suggests 'considerable' or 'specified to a large degree.'" Id. at 307 (quoting Sutton v. United Airlines, Inc., 527 U.S. 471, 118 S.Ct. 2139, 2150 (1999)).  Such limitations need not be insurmountable, however, since "while substantial limitations should be considerable, they should also not be equated with 'utter inabilities.'" Id. (quoting Kirkingburg, 119 S.Ct. at 2168).  Evaluating the magistrate judge's recommendation therefore requires that we examine closely the limitations suffered by the plaintiff as a result of his PTSD.

An impairment substantially limits a major life activity when an individual is "unable to perform a major life activity that the average person in the general population can perform; or [is] significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."  29 C.F.R. § 1630.2(j).  "Major life activities include 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.'"  Walsh v. Mental Health Ass'n, 168 F.3d 661, 665 (3d Cir. 1999).

Plaintiff points to documentation from the Veteran's Administration that indicates he suffered from the disabling condition of PTSD as evidence that he qualified as a person substantially limited under the ADA.  The document the plaintiff provides, which appears to be the third page of a medical report detailing plaintiff's treatment for his post-traumatic stress disorder, indicates that the condition plaintiff

22

faced was "50 percent disabling," an assessment that had first been made in

February 1999.  (Exh. D, Plaintiff's Brief in Opposition to Defendant's Motion for

Summary Judgment (Doc. 52) (hereinafter "Exh. D") at 1).[13]  The medical

examination revealed that plaintiff suffered from "a depressed mood," and was

"extremely defensive . . . with forceful speech."  (Id.).  Though plaintiff appeared

"coherent and relevant," he "felt worthless, helpless and hopeless."  (Id.).  Plaintiff

admitted to "passive suicidal thinking," but lacked "any intent or plan."  (Id.).  In

addition, plaintiff experienced nightmares and appeared "extremely avoidant of

others."  (Id.).  At the same time, however, plaintiff suffered no significant loss of

memory, and his "attention span and concentration were adequate and his judgment

and insight were fair to good."  (Id.).

    The evaluator noted that plaintiff exhibited "serious symptoms" and assigned a

"global assessment functioning score of 41."  (Id.).  Though plaintiff's reported

symptoms may have met the requirements for a 70% evaluation, the evaluator found

that "the fact that he continues to function in his employment, and routine treatment

---

[13]The medical report described an evaluation of fifty-percent disability as "occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect, circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory . . . ; impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships." (Exh. D).  We note, however, that this description should not be taken to describe plaintiff's condition, but instead be seen as a general statement of the typical symptoms of one assigned plaintiff's functioning score.  There is better evidence in this document for plaintiff's actual condition.

records showing a clearer picture of his everyday symptoms, noted to be mild to moderate, the current 50% evaluation is confirmed and continued." (Id.).

This document does not provide evidence that raises a material fact which could lead a jury to conclude that plaintiff was disabled.  The statement provides a medical diagnosis that indicates a degree of impairment, and hints that a person with such impairment may have difficulty functioning.  We note that the Supreme Court has concluded that under the ADA "[i]t is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of impairment."  Toyota Motor Mfg., 534 U.S. at 198; see also, Olson v. G.E. Astrospace, 101 F.3d 947, 953 (3d Cir. 1996) (holding that evidence that "reflects [plaintiff's] ability to function normally despite what appear to be serious psychological and emotional problems defeats" plaintiff's claim of substantial limitations under the ADA).  Plaintiff needs to provide evidence of how his diagnosed PTSD limited his ability to perform specific tasks.  The evidence in this document is of only limited worth in such matters; while the document points out that plaintiff had difficulty socializing, it also notes that he was able to function well at work and perform his required duties.  This document provides no evidence of any particular ways that plaintiff was significantly limited in performing the major life activity of working.

In Taylor v. Phoenixville Area Sch. Dist., the Third Circuit Court of Appeals concluded that a woman who suffered from bipolar disorder which she treated with

24

medication was disabled, since even with her medication she suffered substantial

limitations to ordinary activities like thinking.  184 F.3d at 309-311.  The plaintiff had

to be hospitalized after initially experiencing paranoia and delusions related to her

disease.  Id. at 309.  A few months later, she required hospitalization, and she

"sought treatment twenty-five times throughout the year," taking daily medication that

mandated "careful monitoring."  Id.  The court concluded that plaintiff's failure to

"[experience] problems every day does not defeat her claim."  Id.  The court

recognized that "[c]hronic, episodic conditions can easily limit how well a person

performs an activity as compared to the rest of the population: repeated flare-ups of

poor health can have a cumulative weight that wears down a person's resolve and

continually breaks apart longer-term projects."  Id.; but see, Tedeschi v. Sysco

Foods of Philadelphia, *2 (E.D. Pa. Sept. 5, 2000) (plaintiff did not suffer from a

substantially limiting condition though he suffered from PTSD that led to various

conditions, such as "overreacting to stressful situations, difficulty sleeping, high

blood pressure, apprehension, depression and paranoia"); Hamilton v. SW Bell Tel.

Co., 136 F.3d 1047, 1051 (5 th Cir. 1998) (finding that plaintiff suffering from PTSD

was not disabled within the meaning of the ADA because he did not suffer from a

substantial limitation of any major life activity).  Plaintiff's case is different from

Taylor; while he provides a diagnosis of a condition that was potentially severe, he

does not provide evidence that *his* particular condition represented a severe

limitation on his ability to work.

25

Indeed, plaintiff's work record and his own statements demonstrate that he was able to work despite his periodic episodes of discomfort.  Plaintiff insisted that he could perform his job quite well: "I pretty well knew the system pretty good . . . I knew–a lot of things I knew better than the boss did . . . Some bosses asked me questions about certain things."  (Plaintiff's Dep. at 145).  The medication he took sometimes made him less capable, causing him to "forg[e]t to say appreciate," though plaintiff denies he forgot other procedures.  (Id.).  Even on those days when his symptoms and responses to medication were worst, plaintiff testified that he "never" forgot verification codes because he was "strict on that.  I don't let somebody else come in and take the money, because I got my checkbook stolen one time when I was in business."  (Id.)  Except for a two-week period in January 2005 when he had to adjust his medication, however, plaintiff was "able to understand what the job required."  (Id. at 172).  Plaintiff also testified that he sometimes had difficulty performing his work if he heard children crying in the background during calls or confronted a customer who professed an inability to make the required payments.  (Id. at 80).   Such calls "bugged" plaintiff, and he may have told a doctor that he wished he could work fewer hours per day as a result of these anxieties.  (Id. at 81).  Prior to receiving low performance scores in early 2005, plaintiff "thought [he] was doing good or somebody would [have] come down on" him.  (Id. at 70).  He was sure that his performance was acceptable, "until I seen the scores."  (Id. at 71).

Plaintiff continued to profess little limitation on his ability to work after he lost

his job with defendant.  He testified that while his condition sometimes made face-to-face interaction with people difficult, if he "could talk to somebody over the phone . . . that would be great."  (Id.. at 187).  His job with the defendant "was a perfect job. Bank of America, because I didn't have to face people face to face."  (Id.).  Plaintiff also testified that he had plans to look for jobs.  (Id. at 225).  The work he sought was in customer service, preferably full time, and admitted that no doctor had ever told him that such a setting was too stressful for him.  (Id.).

Plaintiff's own testimony, then, indicates that he was not substantially limited in the major life activity of working by his PTSD.  While he found performing his job difficult sometimes, he contends that he competently performed all of the required tasks.  Any limitations caused by anxiety and other PTSD-related symptoms were infrequent, minor and did not result in any significant restrictions on plaintiff's performance.  We will adopt the report and recommendation on this point.

Plaintiff contends that he had difficulty sleeping as a result of his condition, and presents some evidence of this condition.  Courts have concluded that sleeping is a major life activity, and that a plaintiff could establish a disability by demonstrating that he suffered a substantial limitation in his ability to sleep.  See, e.g., Sloan v. City of Pittsburgh, 110 Fed. Appx. 207, 212 (3d Cir. 2004); Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 644 (2d Cir. 1998); Peter v. Lincoln Technical Institute, 255 F. Supp. 2d 417, 432 (E.D. Pa. 2002); Popko v. Pa. State Univ., 84 F. Supp. 2d 589, 593 (M.D. Pa. 2000).  Mere difficulty sleeping, however, does not reach the

level of substantial impairment that qualifies as a disability.  See, e.g., Parker v. City of Williamsport, 406 F. Supp.2d 534, 545 n.10 (M.D. Pa. 2005) (finding that where "[o]ther than vague generalities" and reports from a doctor "indicat[ing] that [plaintiff] ha[d] interrupted sleep, but is 'able to fall back to sleep'" the evidence was too "sparse" to hold that "a reasonable jury could find that plaintiff is substantially impaired in the major life activity of sleeping.").  A court must examine closely the limitations posed by an individual plaintiff's difficulties in sleeping to determine whether the plaintiff is thereby disabled.  See Peter, 255 F. Supp. 2d at 432 (holding that "[a]s with socialization problems, sleep disorders vary widely in severity.").

In this case, the evidence indicates that plaintiff's difficulties in sleeping were periodic, and not especially severe.   Plaintiff testified at his deposition that his problems with sleep and bad dreams increased dramatically after he lost his job. (Plaintiff's Dep. at 159).  Plaintiff found his situation "100 percent" worse after his firing.  He had frequent dreams of incidents that occurred during his service in Vietnam, and these dreams sometimes caused him to wake up.  (Id.).  Doctors had prescribed medication, but even "on the medication [plaintiff still] dream[ed], dream[ed] and dream[ed] and sometimes [he] [took] Seriquil."  (Id.).  The medication prevented dreams, but he still spent the following day thinking about the subjects of such dreams.  (Id.).  While plaintiff was working, such bad dreams occurred perhaps "once a week or once every two or three weeks, a couple in a row, once a week and then maybe not for a couple of weeks."  (Id. at 160).  Since his termination, however,

the dreams and associated difficulties were much more frequent.  (Id.).  Such bad dreams, however, did not always cause plaintiff to wake up.  (Id.).[14]  This evidence does not indicate that plaintiff suffered from a disorder that substantially limited his ability to sleep while working for defendant.  Plaintiff clearly had some occasional difficulties sleeping, but nothing indicates that the condition was pervasive or that it caused plaintiff to miss work or limited his ability to perform his job.

Plaintiff also contends that he suffered from social anxiety as a result of his PTSD.  During his deposition, plaintiff testified that he engaged in relatively normal social activities both at home and at work.  He woke about forty-five minutes before his work started, got himself something to eat and drove to work.  (Plaintiff's Dep. at 162).  At work, he had lunch in the company cafeteria, often eating with "a couple" of coworkers.  (Id. at 162-63).  He was not particular about the identity of these lunchmates, but would sit with "whoever would sit next to me."  (Id. at 163).  Plaintiff usually spent his afternoon break at his desk, checking e-mail.  (Id.).  Usually, however, he would go to the break room for a soda at the start of that period.  (Id.).  He would say hello to whoever was in the room at the time.  (Id.).  Plaintiff frequently attended a monthly happy hour on Fridays with co-workers after work.  (Id. at 164).

---

[14]Plaintiff also testified that he suffered from sleep apnea shortly before defendant fired him.  He used a C-PAP machine to reduce the effects of that condition: "Q.  How long have you had that machine?  A.  Right before I got fired.  Q.  You said you got the machine in 2005?  A.  They said I was falling asleep at meetings and they said to wake up.  What are you doing?  I figured there was something wrong, so I got the machine and I don't fall asleep any more.  Q.  Right."  (Plaintiff's Dep. at 160-61).

On most nights, plaintiff spent the evening at home, reading the paper, making dinner or taking his dog for a walk.  (Id. at 165).  He would sometimes watch television and on Friday nights watched his nephew play football or baseball.  (Id. at 165-66).  According to his testimony, plaintiff's PTSD did not substantially limit him from normal social activities.  Though he did not frequently attend public events, plaintiff offers no evidence that his illness prevented him from doing so.  Indeed, plaintiff testified that he attended public sporting events, went to dinners at bars and had a regular group of lunchmates at work.  Plaintiff therefore has not offered evidence by which a reasonable jury could conclude that his PTSD substantially limited the major life activity of socializing.

In short, plaintiff has not offered evidence that demonstrates that his PTSD substantially limited any major life activity.  We will therefore dismiss the plaintiff's objections on this point and adopt the magistrate judge's conclusion that plaintiff was not a qualified individual with a disability within the meaning of the ADA.

### iii.  the court's determination that defendant did not consider plaintiff to be disabled by his PTSD

Plaintiff could still qualify for protection under the ADA if he could establish that defendant considered him as disabled.  Several of plaintiff's objections relate to the question of whether defendant regarded plaintiff as disabled for purposes of the ADA.[15]  Since a determination that plaintiff is disabled or considered disabled is a

---

[15]We note that courts have found that plaintiffs can both claim that they are disabled and regarded as disabled, since pleading in the alternative is allowed under the federal

threshold question in any ADA action, we will address plaintiff's objections on this

matter altogether.  Though we agree with the magistrate judge that plaintiff has not

established that he is disabled under the standards established by the ADA, he

could nevertheless be entitled to relief under that statute if he could prove that his

employer regarded him as disabled.  See 42 U.S.C. 12111(8)(C) (establishing that a

person who is not substantially limited in a major life activity can nevertheless be

disabled if an employer "regard[s]" her as "having such an impairment").  Still, "the

mere fact that an employer is aware of an employee's impairment is insufficient to

demonstrate either that the employer regarded the employee as disabled or that the

perception caused the adverse employment action."  Kelly v. Drexel Univ., 94 F.3d

102, 109 (3d Cir. 1996).  The standards under this portion of the ADA are similar to

those under other parts of the disability definition provision: to qualify as disabled

under this portion of the statute, "the individual must demonstrate either that: (1)

despite having no impairment at all, the employer erroneously believes that the

plaintiff has an impairment that substantially limits major life activities; or (2) the

plaintiff has a nonlimiting impairment that the employer mistakenly believes limits

major life activities."  Tice, 247 F.3d at 514.  Under either of these theories, "the

definition of 'substantially limits' remains the same as it does in other parts of the

_____

rules.  See Taylor v. Pathmark Stores, 177 F.3d 180, 189 (3d Cir. 1999) (finding that "[t]he
possibility that plaintiff will bring both an actual disability and a 'regarded as' claim is simply
one allowed by the law; its possible abuse must be checked by the standard measures for
deterring frivolous or bad-faith complaints.").

statute–i.e., if the individual attempting to establish that the employer believed the individual to be limited in the life activity of 'working,' then 'working' must encompass a broad class of jobs."

Federal regulations offer three categories of people regarded as having an impairment under the ADA: "(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation; (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitude of others toward such impairment; or (3) Has none of the impairments defined in paragraph h(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment."  29 C.F.R. § 1630.2(I).  The inquiry in such instances focuses on the employer's perception of the plaintiff, not on the plaintiff's disabilities.  Buskirk v. Apollo Metals, 307 F.3d 160, 167 (3d Cir. 2002) (finding that "[i]n order to determine whether Apollo Metals regarded Buskirk as disabled, we must consider the information Apollo Metals had regarding Buskirk's condition and its response to that information."). Courts do not require that a defendant's assumptions about a plaintiff be motivated by prejudice or stereotypes about the disabled, since "even an innocent misperception based on nothing more than a simple mistake of fact as to the severity, or even the very existence, of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability."  Deane v. Pocono Med. Ctr., 142 F.3d 138, 145 (3d Cir. 1998).   When making this determination, "an employer's

perception that an employee cannot perform a wide range of jobs suffices to make out a 'regarded as' claim." Buskirk, 307 F.3d at 167.

The magistrate judge found that plaintiff had produced no evidence to indicate that defendant regarded plaintiff as disabled, and recommended that we grant summary judgment on these grounds.  Plaintiff disputes this contention, pointing to evidence he claims could convince a reasonable jury that defendant perceived him as substantially limited in a major life activity.  He points to several pieces of evidence which he claims demonstrate this perception.  That evidence includes alleged statements from the plaintiff to his employer that he suffered from PTSD and documentary evidence allegedly seen by plaintiff's employer that references a disability from PTSD.  Plaintiff also contends that the fact that defendant fired him once a supervisor perceived that he suffered from PTSD is evidence that defendant regarded him as disabled.

Initially, we note that there are occasions where mere knowledge of a person's medical condition could lead the employer to regard that person as disabled: "if an impairment at a certain level of severity would constitute a disability, then it follows that an employer who perceives an employee as having such an impairment perceives the employee as disabled." Taylor, 177 F.3d at 188.  We do not find, however, that the evidence indicates that defendant found plaintiff's condition so severe that we could conclude that defendant regarded plaintiff as *per se* disabled. Nothing in the evidence indicates that defendant assumed plaintiff could not work

33

because of the PTSD he reported to the company, or that defendant assumed that PTSD was a condition that precluded employment.

Here, the evidence indicates that defendant was aware that plaintiff occasionally suffered from complications from PTSD that caused him to need time off from work to receive some treatment.  Plaintiff informed his supervisor, Williamson, that he suffered from the condition.  An issue of fact also exists as to whether he provided the succeeding supervisor, Schultz, with this information by giving her some portion of a diagnosis provided by Veteran's Administration doctors. A jury could conclude, therefore, that defendant knew that plaintiff complained of PTSD.  The mere fact that defendant was aware of plaintiff's condition, however, is not evidence that defendant considered plaintiff to be disabled.  No evidence demonstrates that defendants perceived plaintiff to suffer from a condition that substantially limited him in performing everyday activities.  No evidence indicates that defendant's knowledge created an expectation that plaintiff could not perform his job.  To the contrary, the evidence demonstrates that defendant considered plaintiff capable of performing his required tasks, but that he neglected to do so. While Schultz may have appeared less-than-understanding about plaintiff's condition, no evidence indicates that her lack of sympathy led her to determine that plaintiff could not perform his job, i.e. that he was disabled.

The contrast between this case and Deane v. Pocono Med. Ctr. is instructive. In Deane, the court concluded that plaintiff had produced sufficient evidence to

34

survive summary judgment on the issue of whether plaintiff's employer regarded her as disabled.  Plaintiff was a registered nurse who had previously worked mostly on a medical and surgical floor at a hospital.  Deane, 142 F.3d at 141.  She tore cartilage in her wrist while lifting a patient, and was forced to miss a year of work.  Id.  When ready to return to work, plaintiff informed her employer's benefits coordinator that she intended to return to work, but would need certain restrictions on lifting and performing repetitive tasks.  Id.  Plaintiff listed serval specific restrictions, and offered to assume another nursing job at the hospital if her required restrictions made working on the surgical floor impossible.  Id.  The employer, without making any investigation into plaintiff's condition beyond plaintiff's own reports, determined that she could not perform her previous job and that no other sort of light duty job would accommodate her.  Id.  In determining that the defendant regarded plaintiff as disabled, the court pointed to deposition testimony indicating that the employer suffered from "confusion as to the extent of Deane's physical capacity, with regard to pushing, pulling and lifting."  Id. at 145.  Plaintiff also produced evidence that the employer "fundamentally misunderstood and exaggerated the limitations that" plaintiff's injury caused.  Id.  Rather than investigating plaintiff's actual physical limitations by contacting her doctors or arranging for an independent review of medical records, the employer simply "relied soley on one telephone conversation it had with Deane."  Id.

Plaintiff's situation is quite different.  While he has produced evidence by

which a reasonable juror could conclude that defendant was aware that plaintiff suffered from PTSD, defendant's actions after acquiring that knowledge are not evidence that defendant regarded plaintiff as disabled.  While in <u>Deane</u> the employer immediately assumed that plaintiff would be incapable of performing her job because of her injury, plaintiff here offers no evidence to indicate that defendant responded to revelations about his condition by precluding defendant from performing any particular task.  The standards by which plaintiff was judged were not changed and defendant did not exclude plaintiff from any particular tasks.  Moreover, no evidence indicates that defendant fired plaintiff because it perceived him as incapable of performing necessary functions of his job.  Instead, the evidence indicates that defendant terminated plaintiff because he did not perform his job to the standard his employer required.  No reasonable factual dispute exists, therefore, over whether defendant regarded plaintiff as disabled, and summary judgment is appropriate for plaintiff on this issue as well.

**Conclusion**

Because the plaintiff cannot meet the threshold test for relief under the ADA–that he suffers from a disability that substantially limits a major life activity or was regarded by his employer as suffering from such a condition–we will adopt the report and recommendation and grant summary judgment to the defendant.  An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL WALSH,** | : | **No. 3:06cv504** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **BANK OF AMERICA,** | : | |
| **Defendant** | : | |

## ORDER

**AND NOW**, to wit, this 26th day of March 2008, the plaintiff's objections (Doc. 61) to the report and recommendation of Magistrate Judge Blewitt are hereby **OVERRULED**.  The report and recommendation (Doc. 60) is **ADOPTED**.  The defendant's motion for summary judgment (Doc 29) is **GRANTED**.  The Clerk of Court is directed to **CLOSE** the case.

BY THE COURT:

s/ James M. Munley
JAMES M. MUNLEY
UNITED STATES DISTRICT JUDGE