# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL WALSH,** | : | **No. 3:06cv504** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **BANK OF AMERICA,** | : | |
| **Defendant** | : | |

## MEMORANDUM

Before the court is defendants' motion for summary judgment. The court had previously granted that motion. The Third Circuit Court of Appeals reversed that opinion and remanded that case for further proceedings. This opinion continues those proceedings.

**Background**

This case arises from plaintiff's employment with defendant as a customer service representative at defendant's Scranton, Pennsylvania call center. (Defendant's Statement of Material Facts (Doc. 31) (hereinafter "Defendant's Statement") at ¶¶ 1, 3).[1] As a customer service representative, plaintiff answered inbound calls from customers regarding their bank accounts. (Id. at ¶ 7). His job required that he perform account maintenance on customer's accounts, answer

---

[1] Defendant filed a statement of material facts in connection with its motion for summary judgment, and plaintiff responded to this statement. The court will cite to the defendant's statement for facts that are undisputed and note where the facts are disputed and material.

questions, make changes to accounts, and sell other banking products to those customers. (Id.). Plaintiff held that job from December 1999 until May 18, 2005, when he was terminated. (Id. at ¶ 1). Sometime in the mid 1990s, plaintiff was diagnosed as suffering from post-traumatic stress disorder ("PTSD") as a result of his military service in the Vietnam War. (Id. at ¶ 4).

The parties disagree about the nature and extent of training plaintiff received for his position. (See Defendant's Statement at ¶¶ 8-9, Plaintiff's Counterstatement of Material Facts (hereinafter "Plaintiff's Statement") at ¶¶ 8-9). Plaintiff worked with dozens of other employees as he answered phones from a cubicle in defendant's call center. (Defendant's Statement at ¶ 10). These employees were broken into smaller groups and assigned a particular supervisor. (Id.). Maureen Williamson served as one of plaintiff's supervisors during most of his employment. (Id.). She did not serve in this position continuously, however, and plaintiff described her presence as "on and off." (Plaintiff's Deposition (hereinafter "Plaintiff's Dep."), attached as Exh. A (Doc. 52-2) to Plaintiff's Statement at 54). Other managers supervised plaintiff during Williamson's absences. (Affidavit of Maureen Williamson (hereinafter "Williamson Dep." attached as Exh. B. to Defendant's Statement, at ¶ 3). In February 2005, Williamson assumed a new role in the bank and plaintiff joined a "team" supervised by Elizabeth Slattery. (Defendant's Statement at ¶ 11). In March 2005 Slattery moved out of state and management again assigned plaintiff to a new group, this one supervised by Patricia Shultz. (Id.).

Plaintiff typically worked eight hours a day. (Plaintiff's Dep. at 53). At first, he began working at 11:30 a.m., but gradually began to take earlier shifts. (Id.). Eventually, he started his work day around 7 a.m., remaining until 3 p.m. (Id.). He preferred that shift. (Id.). Though plaintiff was allowed breaks during his shift, he was generally expected to remain at his desk and answer telephone calls. (Defendant's Statement at ¶ 13).

Company officials monitored and evaluated plaintiff's job performance. These evaluations rated plaintiff on a performance scale from 1 to 5, with 5 being the highest score. A score of 3 indicated a "solid performer" and a score of 2 suggested "improvement needed." (See Defendants' Exh. D-3 (Doc. 32-4)). In 2002, Williamson evaluated plaintiff, finding him satisfactory or higher in every category the company used.[2] (Doc. 32-1). Plaintiff's 2003 evaluation consisted mostly of positive ratings, with scores of 3 or higher. (Doc. 32-3). Williamson found, however, that plaintiff needed improvement in communication and "results orientation." (Id.). Plaintiff's evaluation in 2004 was similar, though he had improved his "results orientation" score to a 3. (Doc. 32-4). Supervisors also evaluated plaintiff's work fielding telephone calls. These ratings were performed by supervisors and evaluators who randomly listened to a series of calls and gave them a percentage score. (Affidavit of Walsh, Exh. B. At ¶ 6). Screeners considered communication

---

[2]Neither Slattery nor Schultz supervised plaintiff long enough to provide an evaluation. (Defendant's Statement at ¶ 16).

skills and adherence to Bank procedures, among other factors, in evaluating representatives' performance.  (Id. at ¶ 7).

The parties disagree about how frequently supervisors listened to calls the plaintiff handled.  (Id. at ¶ 18).  Different persons would listen to calls and evaluate them in an attempt to achieve consistency in evaluations.  (Id. at ¶ 19).  Plaintiff insists that his calls did not go through this "calibration" process, since wide differences between the scores assessed by different evaluators existed for his calls.  (Plaintiff's Statement at ¶ 19).  To achieve a passing score on these evaluations, a representative needed to receive a grade of 81.82%.  (Defendant's Statement at ¶ 20).  Scores lower than that range indicated that the representative had failed to follow procedures required for such calls.  (Id.).  Plaintiff contends that he consistently received high scores on these evaluations, and that his scores only decreased when defendant decided to discriminate against him.  (Plaintiff's Statement at ¶ 20).  Plaintiff received scores of 57.58% in both April and May of 2005.  (Defendant's Statement at ¶ 21).  He contends that no valid reason existed for assigning these scores, though he does not dispute receiving low scores on occasion.  (Plaintiff's Statement at ¶¶ 21-22; Defendant's Statement at ¶ 22).  Plaintiff received other low scores as well.  (Defendant's Statement at ¶ 23; Plaintiff's Statement at ¶ 23).[3]

_____

[3]Plaintiff contends that when he "began to notice that his scores were lower than normal he went to Williamson and asked for training and a sit down.  She told him not to worry and that she only had time for people with problems.  Plaintiff noticed that although

4

Plaintiff received counseling from Williamson for his low performance scores in December 2004. (Defendant's Statement at ¶ 24). The parties disagree over whether Williamson identified specific problems with plaintiff's performance in their meeting. (Id.; Plaintiff's Statement at ¶ 24). During this session, plaintiff noted that he had consistently received good performance evaluations and asked why he had been assigned training. (Id.). In early 2005, Williams issued plaintiff a formal "Development Action Plan," which noted deficiencies in his performance and that he receive particular training. (Defendant's Statement at ¶ 25; Plaintiff's Statement at ¶ 25). The parties dispute whether plaintiff actually signed this action plan. (Defendant's Statement at ¶ 26; Plaintiff's Statement at ¶ 26). Plaintiff ascribed at least some of his problems at the end of 2004 and beginning of 2005 to changes in the medication he was taking. (Defendant's Statement at ¶ 27; Plaintiff's Statement at ¶ 27). He also told Williamson in spring 2005 that his medication had been changed, and on at least one day he left work early due to the effects of this change. (Defendant's Statement at ¶¶ 28-29; Plaintiff's Statement at ¶¶ 28-29). Plaintiff testified that he returned to work the next day and did not have any "follow-up conversation" with Williamson about his medication.[4] (Plaintiff's Dep. at 77). He

_____

his scores were lower so were the target scores. The scores were listed at 77% and 78%. His scores were more in line with these target scores and therefore was surprised after asking for training and direction from Williamson that he was instead presented with a verbal warning.

[4]Plaintiff denies the sequence of these conversations, but does not deny that he did not raise the issue of the effects of his medication with Williamson after April 2005. (See Plaintiff's Statement at ¶¶ 28-29).

also testified that his mental state while working for defendant "was active; and if somebody said something I would know it. I got to know the job pretty good." (Id. at 171-72). Except for a period of two weeks in 2005 when he was "a little shaky," plaintiff "was able to understand what the job required." (Id. at 172). As a result of these discussions about medication, as well as earlier personal conversations, Williamson was aware of plaintiff's PTSD and some of the symptoms he suffered therefrom sometime before April 2005. (Defendant's Statement at ¶ 31; Plaintiff's Dep. at 84).[5] Plaintiff told Williamson that he had bad dreams, but provided little other detail about his condition, and did not tell her that PTSD effected his job performance, since he "was doing fine on [his] job."[6] (Plaintiff's Dep. at 83, 85).

Criticism of plaintiff's performance grew after Williamson left and Patricia Schultz became his supervisor. Schultz testified that she was aware that plaintiff had difficulties with his performance under the previous supervisor, but insisted that she was not aware that he suffered from PTSD or any other ailment. (Schultz Affidavit., Exh. E to Defendant's Statement at ¶ 3). During March and April 2005

---

[5]Plaintiff's deposition testimony is somewhat unclear about exactly when he informed Williamson that he suffered from PTSD. He testified that "I told [Williamson] I was a disabled veteran in 2000, but if I told her I had PTSD or not I do not remember that specifically. I did at one time tell her that I had PTSD because her son was going to Iraq and she was worried about him." (Plaintiff's Dep. at 83). When pressed about the date of this conversation, plaintiff replied that "It was 2003, 2004 yes." Id.

[6]Plaintiff contends that "[a]lthough Plaintiff did not discuss in detail the symptoms of PTSD[,] as a supervisor Ms. Williamson would be aware that accommodations must be made for disabilities such as PTSD and should have conducted an investigation." (Plaintiff's Statement at ¶ 32).

plaintiff received a series of unsatisfactory results on his performance scores.

(Defendant's Statement at ¶ 34).[7]  These results led to discussions with Schultz,

particularly over an April 2005 call where the plaintiff gave a customer a rebate

without a request from that customer.  (Id. at ¶ 35).  Plaintiff received a verbal

warning for this action, though he contends that he acted in the best interest of the

company by anticipating the customer's account problems and preventing the need

for her to call on another day and receive another rebate.[8]  (Plaintiff's Statement at ¶

35).

The parties disagree about whether plaintiff informed Schultz that he suffered

from PTSD during this meeting.  (Defendant's Statement at ¶ 36; Plaintiff's

Statement at ¶ 36).  Plaintiff alleges that he gave Schultz a document that described

the PTSD from which he suffered, but admits that the document did not relate any

---

[7]Plaintiff denies this statement, but in explaining his denial does not address the number of low scores he received.  Instead, he insists that he made Walsh aware of his illness, told her he was having problems with his medication, and requested certain accommodations for his illness.  (See Plaintiff's Statement at ¶ 34).

[8]Plaintiff explained the situation this way: he received a score of "72 for it, which was a bad score, saying that I didn't do something in the best interest of Bank of America.  The story was that some young lady called me up and she never had a rebate before.  She got a $25 overdraft fee and the next day she was going to get two more, which totaled another $50.  I knew when she seen that she'll call back the next day.  I have been there five years and I know what is going on.  She started complaining and I said that I'll give you $25 back.  She did not ask for it.  I knew she would call back the next day and probably get $50 or $75 back.  So Ms. Schultz–as a good a supervisor as she is, . . . didn't look and see that she was going to get two more overdrafts.  All she said was that I didn't work in the best interest of the Bank of America, which I did work in the best interest of Bank of America, because I helped her out then so she wouldn't call the next day and get another two rebates."  (Plaintiff's Dep. at 96-97).

specific symptoms the plaintiff suffered.  (Plaintiff's Dep. at 106).[9]  The parties agree, however, that plaintiff ascribed some of his difficulties to changes in his medication.  (Defendant's Statement at ¶ 38).  Plaintiff contends that at some point he informed plaintiff of his disease and asked to be placed on six-hour days.  (Plaintiff's Statement at ¶ 38).  The parties agree that at some point Schultz requested that plaintiff provide her with documentation of his condition.  (Plaintiff's Statement at ¶ 38; Defendant's Statement at ¶ 40).

Due to plaintiff's continuing performance problems, Schultz contacted the Advice & Counsel division of defendant's human resources department.  (Defendant's Statement at ¶ 39).  She informed them of plaintiff's low monitoring scores and described the contents of one particular call, which received a score of 57.8%.  (Id.).  Schultz contends that it was after this meeting that she asked plaintiff to provide documentation of his illness.  (Id. at ¶ 40).  Plaintiff provided Schultz with an undated, unsigned excerpt from a medical analysis of his symptoms, as well as a pamphlet about PTSD issued by the VA hopsital in Coatesville, Pennsylvania.  (Id. at ¶ 41).  Plaintiff provided no other material on his condition to defendant.  (Id. at ¶ 42).  Upon receiving this material, Schultz told plaintiff that her father was a veteran as well.  (Id. at ¶ 43).  Plaintiff insists that Schultz also "rolled her eyes up in the air"

---

[9]Plaintiff's testimony related that: "Q.  The paper that you gave to Ms. Schultz, did it say anything about your condition and the symptoms that you have?  A.  All it did was show the symptoms that a person with PTSD would have.  Q.  Any person?  A.  Any person.  It showed like I get 50 percent of . . . you can still be employable.  70 percent–it goes down like that."  (Plaintiff's Dep. at 106).

when she made this remark, and that he perceived her attitude towards him changing "for the worse" after this point. (Plaintiff's Statement at ¶ 43). Schultz also provided plaintiff, on May 6, 2005, with a "final written counseling–performance." (Defendant's Statement at ¶ 44). That written warning concluded that plaintiff had failed to improve his performance on calls and had continued not to verify information as required by company rules. (Id.). The document warned that failure to improve performance could "result in further disciplinary action up to and including termination." (Id.).

Between May 6 and May 18, 2005, Schultz monitored three of plaintiff's calls. (Defendant's Statement at ¶ 45). All of those calls received ratings below 81.82%, which defendant insists was the minimum required by the company. (Id.). Plaintiff disputes that, contending that he needed only to reach 77% or 78% under company rules. (Plaintiff's Statement at ¶ 45). Schultz determined that plaintiff failed properly to verify a customer's identity on at least one of the calls. (Defendant's Statement at ¶ 46). She had recorded this call, and played a tape of it for her supervisor, Dorothy Walker. (Id.). Walker listened to the call, and then endorsed Schultz's recommendation that Walsh be terminated. (Id.). Walker claims she was not aware that plaintiff suffered from PTSD when she recommended his firing. (Id.; Deposition of Dorothy Walker, Exh. B. to Defendant's Satement at ¶ 10).[10] After speaking with

---

[10]Plaintiff contends that "[i]t is not known that Walker didn't have information concerning Walsh's disability as it was posted on his employee profile, but it is relevant as Schultz knew as well as other supervisors and Advice & Counsel. It is seeming unrealistic

Advice & Counsel, Schultz determined to fire the plaintiff. (Defendant's Statement at ¶ 47). On May 18, 2005, during a meeting at which Walsh was present, Schultz informed plaintiff that he had been terminated. (Id. at ¶ 48). Plaintiff did not mention his PTSD at this meeting. (Id.).

On March 8, 2006, plaintiff filed his complaint in this court. (See Complaint (Doc. 1) (hereinafter "Complt."). That complaint alleged that plaintiff suffered from post traumatic stress disorder, and that he had informed his employer of that condition. (Id. at ¶¶ 10-11). The complaint raised two counts. First, plaintiff alleged that defendant violated his rights under the Americans with Disabilities Act, 42 U.S.C. § 12101 ("ADA") by taking an adverse employment action against him because of his disability. (Id. at ¶ 24). Count II brought identical claims under the Pennsylvania Human Relations Act, 42 P.S. § 955(a) ("PHRA"). As relief, plaintiff sought reinstatement and monetary damages. The case was assigned to Magistrate Judge Blewitt for preliminary proceedings, where the parties conducted discovery and the defendant eventually filed the instant dispositive motion.

On November 26, 2007, Magistrate Judge Thomas M. Blewitt issued his report

---

that Schultz who is concerned enough to be speaking to Advice and Counsel would not at least give Walker a heads up as to what legal ramifications this might entail." (Defendant's Statement at ¶ 46). We note, first, that the employee information submitted by plaintiff indicates that he is a "disabled Vietnam veteran," but does not specify that he suffers from PTSD and does not contain any information about his limitations. (See Doc. 52-4). In addition, plaintiff presents no evidence to indicate that Walsh ever read his employee file, that anyone in Advice and Counsel discussed plaintiff's particular health issues with her, or that she spoke with anyone about potential legal liability. A fact is not in dispute if no evidence exists to support the position of the party disputing that fact.

and recommendation in the case. (Doc. 60). Magistrate Judge Blewitt recommended that the court grant defendant's motion for summary judgment on plaintiff's ADA claim. Plaintiff, the magistrate judge found, had not established that he suffered from a disability that substantially limited a major life activity or that defendant considered him to be suffering from such a disability. As a result, no jury could find for him on his ADA claim. The magistrate judge also found that even if plaintiff did suffer from a disability, he was not entitled to relief under the Act because he had not informed his employer of a need for an accommodation. Because claims under the Pennsylvania Human Relations Act share legal standards with those under federal anti-discrimination law, Magistrate Judge Blewitt also proposed that the court grant the defendant summary judgment on plaintiff's PHRA claim.

After the magistrate judge issued his report and recommendation, plaintiff filed objections and a brief in support thereof. Defendant then filed a brief in opposition. The court considered plaintiff's objections and adopted the report and recommendation, finding that plaintiff had failed to make out a prima facie case that he was disabled or considered disabled by his employer within the meaning of the act. As this was the basis of the magistrate judge's opinion, the court did not consider whether summary judgment could be granted on the other grounds, and entered judgment for the defendants. The plaintiff appealed the court's opinion. The Court of Appeals for the Third Circuit reversed and remanded, finding that plaintiff had made out a case that he was considered disabled within the meaning of the Act.

11

The court must now therefore consider whether summary judgment is appropriate even though plaintiff has made out the first part of an ADA case. Rather than remanding the case to the magistrate judge, the court will consider the rest of defendants' motion.

**Jurisdiction**

As this case is brought pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, we have jurisdiction pursuant to 28 U.S.C. § 1332. ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). We have supplemental jurisdiction over the plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

**Legal Standard**

The case comes before this court on a motion for summary judgment. Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. International Raw Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson, 477 U.S. at 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

**Discussion**

Since the court must consider plaintiff's PHRA claim under the same legal standards as his ADA action, the analysis will focus only on the ADA standards. See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (concluding that in a case where plaintiff brought both ADA and PHRA claims "we will only discuss [plaintiff's] ADA claim because our analysis of an ADA claim applies equally to a PHRA claim.").

### i. Disability Discrimination

Under the ADA, an employer cannot discriminate against a qualified individual with a disability because of her disability in regard to her employment. 42 U.S.C.A. § 12112 (a). Further, an employer must make reasonable accommodations to known physical or mental limitations of an otherwise qualified employee with a disability unless such employer can demonstrate the accommodation would impose an undue hardship on the operation of the employer's business. Id. See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (holding that "[d]iscrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities."). Our analysis under the ADA applies equally to plaintiff's claims under the PHRA. See Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).

The plaintiff has the initial burden in an ADA matter of establishing a *prima facie* case. Olson v. General Elec. Astrospace, 101 F.3d 947, 951 (3rd Cir. 1996); Newman v. GHS Osteopahtic, Inc., 60 F.3d 153, 157 (3rd Cir. 1995). A *prima facie* case is established by the plaintiff when she demonstrates: 1)she is a disabled person within the meaning of the ADA; 2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and 3) she has suffered an otherwise adverse employment decision as a result of discrimination. Shiring v. Runyon, 90 F.3d 827, 831 (3rd Cir. 1996); Gaul

14

v. Lucent Technologies, 134 F.3d 576, 580 (3rd Cir. 1998).

If the plaintiff meets this initial burden, the court then applies the next step in "the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803-805." Abramson v. William Patterson College, 260 F.3d 265, 281 (3d Cir. 2001). The burden of production shifts to the employer to "proffer a legitimate, non-discriminatory reason for the adverse employment decision." Id. at 282. An employer need only introduce "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes v. Pierske, 32 F.3d 759, 763 (3d Cir. 1994). "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." Id. (emphasis in original). Once the employer meets this burden, the plaintiff must show that a jury "could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating factor or determinative cause of the employer's action." Id. at 764.

The Court of Appeals concluded that this court erred in finding that plaintiff was not disabled within the meaning of the ADA. This court did not undertake further analysis of plaintiff's claim after finding that he had not met his initial burden, and will do so here.

### a. Prima facie case

The Court of Appeals has found that plaintiff was disabled within the meaning of the ADA. To make out the rest of his prima facie case, plaintiff must establish that "2) [he] is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and 3) [he] has suffered an otherwise adverse employment decision as a result of discrimination." <u>Shiring</u>, 90 F.3d at 831.

Defendants focus on a claim that plaintiff cannot make out the third part of his prima facie case–that he suffered an adverse employment action. They contend that plaintiff has offered no evidence that shows he was terminated because of his disability. The court finds that a jury could conclude that plaintiff suffered an adverse employment action related to his disability. Defendants terminated the plaintiff's employment; though there is a dispute about the reasons for this termination, evidence in the record indicates that plaintiff had discussed his PTSD in the context of defendants' monitoring of his customer-service calls and that his difficulties in performance were tied to his disability or perceptions about it. Thus, plaintiff has met his burden to establish that he "suffered an adverse employment decision because of discrimination." <u>Gagliardo v. Connaught Labs</u>, 311 F.3d 565, 568 (3d Cir. 2002).[11]

---

[11]Defendants cite to <u>Cambria v. Ass'n of Flight Attendants</u>, 177 L.R.R.M. 2854 (E.D. Pa. 2005) in arguing that plaintiff has not met his burden of demonstrating an adverse employment decision because of discrimination. That case is inapposite, as plaintiff sued her union after being fired by her airline, and the court determined that the adverse employment actions were taken by the airline not the union. In this case, defendant Bank of America terminated that defendant, which certainly qualifies as an adverse employment action. The question of whether the adverse employment action was discriminatory is better analyzed from the perspective of the burden-shifting test employed once plaintiff

As such, plaintiff has made out all three parts of his prima facie case and the burden now shifts to the defendant to provide a legitimate, non-discriminatory reason for the employment action.

### b.  Legitimate, Non-Discriminatory Reason

In its initial brief in support of summary judgment, defendant argued that even if plaintiff could show that he was disabled within the meaning of the ADA, it had offered a legitimate, non-discriminatory reason for terminating the plaintiff. Defendant points to evidence it contends establishes that plaintiff performed poorly in the communications area throughout his term of employment with the bank.  He routinely received quality assurance scores below the minimum passing score of 81.82%, despite efforts to provide him with additional training.  Plaintiff also received repeated warnings about his work performance before being terminated.

The court finds that defendants have met their burden of demonstrating a legitimate, non-discriminatory reason for their employment decision; they claim–and record evidence provides support for that claim–that plaintiff's performance was inadequate and justifies his termination.  Plaintiff scored below the minimum required when defendant monitored his calls, and such failings could be legitimate reasons to fire plaintiff.  See Fuentes, 32 F.3d at 763 (finding that "[t]he employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable

_____

makes out a prima facie case.

employment decision.").

### c. Pretext

Since defendant has offered a legitimate, non-discriminatory reason for its employment decision, the burden now shifts back to the plaintiff to demonstrate that a jury "could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating factor or determinative cause of the employer's action." Fuentes, 32 F.3d at 764. To meet this burden, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" Id. at 765. (quoting Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993)) (emphasis added). A "plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether a discriminatory animus motivated the employer, not whether the employer is 'wise, shrewd, prudent, or competent.'" Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 331 (3d Cir. 1995) (quoting Fuentes, 32 F.3d at 764).

As evidence of pretext, plaintiff contends that he began to receive lower test scores after he requested an accommodation of fewer daily hours. Defendant also raised the minimum score for such exams after plaintiff allegedly sought his

18

accommodation.  When he requested training to meet performance requirements, defendant did not provide any relevant assistance.  While complaining about this training, plaintiff also told his supervisor, Patricia Schultz, that he was having problems with his PTSD medication.  (Plaintiff's Dep. at 91).   She ordered him to bring in information about his illness.  (Id. at 99).  Schultz's attitude towards plaintiff worsened after she received this information, and she issued him a final written warning shortly thereafter.  (Id. at 91, 97-98).  Within two weeks, plaintiff had lost his job.  This evidence, plaintiff contends, establishes that defendant terminated him because of his disability, not because of alleged deficiencies in his performance.

The court finds that plaintiff has sufficiently established that evidence exists by which a jury could conclude that the stated reasons for defendant's employment decision were not the real reasons.  Based on the temporal proximity between plaintiff's explanation to Schultz of his disability and defendant's adverse employment action, a reasonable jury could conclude that changed performance standards were a mere pretext for defendant's actual goal: terminating plaintiff's employment.  The court will deny summary judgment on these grounds.

**ii.  Failure to Accommodate**

Defendant also contends that plaintiff has not provided evidence sufficient to support his claim that it failed to provide him with a reasonable accommodation for his disability.  Courts have concluded that when an employee suffers from a disability and seeks an accommodation under the ADA "'both parties have a duty to

assist in the search for appropriate reasonable accommodation and to act in good faith." Taylor, 184 F.3d at 312.  To show that an employer did not properly engage in this "interactive process," an employee must show that: "(1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." Conneen v. MBNA Am. Bank, N.A., 334 F.3d 313, 330-31 (3d Cir. 2003).

Defendant argues that no evidence establishes that plaintiff requested any sort of accommodation on the basis of his disability.  While plaintiff sought a reduced work day, defendant insists that he did not connect those reduced hours to his post-traumatic stress disorder.  Moreover, defendant contends, plaintiff cannot establish either that it denied this request or that working a six-hour day was a reasonable accommodation.

The Court of Appeals has concluded that defendants knew of plaintiff's disability, and the first element of plaintiff's accommodation claim is therefore met. Evidence also supports the second element of such a claim, that plaintiff sought a reasonable accommodation for his disability.  Plaintiff argues that he made four separate efforts to seek a six-hour workday as an accommodation for his disability. At his deposition, plaintiff testified that he had requested part-time work form Williamson several times, only to be rebuffed.  (Plaintiff's Dep. at 119).  Plaintiff also

requested part-time work from Patricia Schultz, by which he meant a six-hour day. (Id.). There is also evidence that plaintiff requested this accommodation because of his disability. He testified that "[w]ith the six hours on the phone I have more time to concentrate. I could concentrate better today, could have kept my job longer. I was thinking about my future down the road. If I was having problems then six hours would help me extend my career at Bank of America instead of being fired. I tried to save my job." (Id. at 122). He also testified that he told defendant's officials that he sought the reduced hours because of his disability and the stress it caused. (Id. at 122, 124). From such evidence, a jury could conclude that plaintiff requested an accommodation for his disability.

Plaintiff also testified in his deposition that, despite his requests, defendant did not make an attempt to accommodate him. Instead, his requests were ignored by supervisors like Williamson. (Id. at 124). Told to provide Williamson with a request for reduced hours, plaintiff did so, but Williamson "never" did anything about it. (Id. at 124). Thus, plaintiff has satisfied this element of his claim: a reasonable juror could find that defendant did not make a good faith effort to accommodate him.

Finally, the court finds that evidence exists to support plaintiff's claim that his request for shorter hours would have accommodated his disability absent defendant's bad faith. Plaintiff points to a letter from Joseph Wideman, a Licensed Professional Counselor and Chemical Abuse Counsellor working at the Vet Center in Scranton, Pennsylvania. (See Exh. B. to Plaintiff's Brief in Opposition (Doc. 48)). In

his letter, Spangler reports that he had begun working as a counselor to plaintiff in October 2003.  (Id.).  He agreed with a previous diagnosis of Post-Traumatic Stress Disorder, Major Depressive Disorder and Alcohol Dependence in Remission, and felt that plaintiff would benefit from individual and group therapy.  (Id.).  Plaintiff reported that he had experienced an on-going difficulty with the stress of his workplace, but had managed to enjoy helping customers.  (Id.).  Since the beginning of 2005, Spangler reported, plaintiff had felt that a change of hours to part-time would help him cope with stress at work.  (Id.).  Spangler agreed that such a change was desirable.  (Id.).  A jury could find that this evidence supports plaintiff's claim.

Plaintiff has therefore satisfied the elements of his failure-to-accommodate claim.  The court will deny summary judgment on this claim and allow trial to proceed on this matter as well.

**Conclusion**

For the reasons stated above, the court will deny the defendant's motion for summary judgment.  The court finds that plaintiff's claims for disability discrimination and for a failure-to-accommodate claim pursuant to the Americans with Disabilities Act should go to trial.  An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL WALSH,** | : | **No. 3:06cv504** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **BANK OF AMERICA,** | : | |
| **Defendant** | : | |

## ORDER

**AND NOW**, to wit, this 11th day of February 2010, pursuant to the mandate of the Third Circuit Court of Appeals (Doc. 68), after reconsideration the defendant's motion for summary judgment (Doc. 29) is hereby **DENIED**.

BY THE COURT:

s/ James M. Munley
**JUDGE JAMES M. MUNLEY**
**UNITED STATES DISTRICT COURT**